UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JANE DOE K.R.,

      Plaintiff,

v.                                  Case No: 6:23-cv-1012-JSS-LHP

CHOICE HOTELS, WHG SU
DELEGATES, LLC, CHOICE
HOTELS INTERNATIONAL, INC.,
and CHOICE HOTELS
INTERNATIONAL SERVICES
CORP.,

      Defendants.
_____/

## ORDER

Defendants have filed *Daubert*[1] motions to exclude opinions offered by Mr. Salvatore Caccavale, a proffered expert on hotel security. (Dkts. 126, 136.) Plaintiff opposes the motions. (Dkts. 159, 160.) Upon consideration, for the reasons outlined below, the court grants the motions in part and denies them in part.

## BACKGROUND

Plaintiff alleges that Defendants owned and operated a hotel in Orlando, Florida, where she was a victim of sex trafficking between February and May 2013. (Dkt. 150.) She sues Defendants under the Trafficking Victims Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1595(a). (Dkt. 150 at 51–54.) In support

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

of her claims, Mr. Caccavale has furnished a thirteen-page report, in which he offers

four opinions:

> (1) The incident involving [Plaintiff] was foreseeable and predictable.
> The hotel's ownership entities [i.e., Defendants] and their employees
> should have anticipated this incident.
>
> (2) Inconsistent documented staff training and the failure to adhere to
> corporate policies contributed to the ease of [the] trafficking of
> [Plaintiff] at the subject hotel location.
>
> (3) Hotel ownership [i.e., Defendants] and their employees should have
> recognized the correlation between drug use and trafficking at their
> hotel and collaborated with local law enforcement to investigate,
> assist, and offer solutions to remedy the nuisances and thereby prevent
> or deter the sex trafficking of [Plaintiff].
>
> (4) The failures and inattention by hotel ownership and hotel leadership
> [i.e., Defendants] exacerbated the open and obvious illicit drug use
> and sex trafficking on their property.  Based on the police incident
> reporting, relevant crime statistics, the high crime area, and the
> obvious red flags of trafficking [Plaintiff] exhibited at the [Orlando
> hotel,] it is reasonable to conclude that the hotel management and
> staff knew that [Plaintiff] was being trafficked.

(Dkt. 126-1 at 8, 10–11, 13.)  Following each opinion, Mr. Caccavale explains its bases

in fact.  (*Id.* at 8–13.)

With respect to his qualifications, Mr. Caccavale lists the committees on which

he has served in his industry, the prior testimony he has given, and the industry

certification he holds.  (*Id.* at 3–5.)  He relates his decades of experience involving hotel

security, and he identifies the resources he uses and events he attends "to develop [his]

knowledge and keep current on industry trends."  (*Id.* at 6–7.)  His curriculum vitae

(attached to his report) supplies additional information about his job experience and

accomplishments, professional affiliations, trainings, and the cases on which he has

worked.  (*See* Dkt. 126-2.)  During his deposition, Mr. Caccavale admitted that his area of expertise is not human trafficking but hotel safety and security.  (Dkt. 136-2 at 4, 18–19.)

With respect to his methodology, Mr. Caccavale describes "a four-part process for rendering analysis concerning security matters."  (Dkt. 126-1 at 7.)  The process entails reviewing evidence of an incident, assessing threats, conducting a security survey to identify vulnerabilities ("security weaknesses or opportunities for criminal activity"), and engaging in analysis to opine about the "adequacy of the security effort at the incident location."  (*Id.* at 7–8.)  According to Mr. Caccavale, this methodology is endorsed by the International Association of Professional Security Consultants (IAPSC) and "is designed to allow . . . security expert[s] to use their education, training, and experience to identify and utilize those factors that apply to the particular facts of the matter under review."  (*Id.* at 8; *see* Dkt. 126-4 at 5–10 (the IAPSC's description of the methodology).)

In his report, Mr. Caccavale lists the discovery documents and other materials that he reviewed to form his opinions.  (Dkt. 126-1 at 3–4.)  These materials include a CrimeCast Basic Report "indicat[ing] the likelihood of crime and loss occurring" at the Orlando hotel.  (Dkt. 126-5 at 2.)  The CrimeCast report, created December 16, 2024, scores the risks of different types of crime around the hotel for 2017 (the database year) and shows a past score for 2010 and a projected score for 2022.  (*Id.* at 2, 4.)  The CrimeCast report provides scores for categories of crimes against persons and property and maps the crime risks for the area around the hotel.  (*Id.* at 3–4.)  Although the

CrimeCast report lists rape, for example, as a category of crimes against persons, it does not mention prostitution, sex trafficking, or human trafficking. (*Id.*) In addition to the CrimeCast report, Mr. Caccavale relies on records from the Orange County Sheriff's Office and information about the hotel and environs obtained from online sources and discovery responses. (*Id.* at 3–4, 8–13.)

During his deposition, Mr. Caccavale stated that he did not perform a threat or vulnerability assessment at the Orlando hotel because he did not "physically go to the property." (Dkt. 136-2 at 41.) However, he testified to following the IAPSC's methodology by performing a vulnerability assessment based on calls for service around the hotel, online reviews of the hotel, and the CrimeCast Report. (*Id.*) He testified that he looked to calls for service from 2010 to 2013 and consulted the CrimeCast report for the crime around the hotel. (*Id.*) When asked for details about how the CrimeCast report was compiled, Mr. Caccavale stated: "[W]e would have to get the [CrimeCast] folks to come in here and explain." (*Id.* at 24–25.) As to the online reviews, Mr. Caccavale testified that Plaintiff's counsel assembled them for him, that the earliest review was from 2015, and that this review referenced prostitution. (*Id.* at 5, 20–21.) Mr. Caccavale further expressed his position that a negative review generally carries more weight than a positive review. (*Id.* at 21.) When asked about the bases for his second opinion, which concerns training at the Orlando hotel, Mr. Caccavale stated that he did not know what training policies were in place at the time of the alleged sex trafficking of Plaintiff. (*Id.* at 31–32.) As to his opinions on drug use, Mr. Caccavale acknowledged that drug use does not necessarily indicate human

trafficking. (*Id.* at 40.) He also testified that Plaintiff used only alcohol and marijuana, as opposed to more serious substances, while she was trafficked. (*Id.*)

## APPLICABLE STANDARDS

"To fulfil their obligation under *Daubert*, district courts must engage in a rigorous inquiry" focusing on three issues: (1) whether "the expert is qualified to testify competently regarding the matters he intends to address," (2) whether "the methodology by which the expert reaches his conclusions is sufficiently reliable," and (3) whether "the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir. 2005) (quotation omitted). "[T]he party seeking to introduce the expert at trial"—here, Plaintiff—"bears the burden of establishing [the expert's] qualifications, reliability, and helpfulness." *Knepfle v. J-Tech Corp.*, 48 F.4th 1282, 1294 (11th Cir. 2022). The court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Cor*p., 298 F.3d 1253, 1256 (11th Cir. 2002). "[T]o be admissible, an expert's testimony must be based on more than subjective belief or unsupported speculation." *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1167 (S.D. Fla. 1996) (quotation omitted).

## ANALYSIS

Defendants challenge Mr. Caccavale's qualifications and the overall reliability of his methodology before making reliability and helpfulness arguments against each

of his four opinions.  (*See* Dkts. 126, 136.)  The court addresses Defendants' general
arguments on qualifications and methodology before turning to the opinion-specific
arguments.[2]

    As to qualifications, Defendants do not dispute that Mr. Caccavale is generally
qualified to opine on matters related to hotel safety and security; however, they
maintain that he cannot offer opinions as to human trafficking because he is not
qualified in that area of expertise.  (Dkt. 126 at 4–7; Dkt. 136 at 6–8.)  Given his
curriculum vitae, which reflects his decades of experience involving hotel security, (*see*
Dkt. 126-2), the court is satisfied as to Mr. Caccavale's qualifications.  *See Skypoint
Advisors, LLC v. 3 Amigos Prods. LLC*, 585 F. Supp. 3d 1326, 1331 (M.D. Fla. 2022)
("The qualification standard for expert testimony is not stringent, and so long as the
expert is minimally qualified, objections to the level of the expert's expertise go to
credibility and weight, not admissibility." (quotation omitted)); *Tillman v. C.R. Bard,
Inc.*, 96 F. Supp. 3d 1307, 1328 (M.D. Fla. 2015) ("As long as an expert stays within
the reasonable confines of his subject area, a lack of specialization does not affect the
admissibility of the expert opinion[] but only its weight." (alterations adopted and
quotation omitted)); *Doe E.M.B. v. G6 Hosp., LLC*, No. 9:23-CV-00173-MJT-CLS, 2025
WL 2556106, at *16, 2025 U.S. Dist. LEXIS 175050, at *51 (E.D. Tex. Apr. 23, 2025)

---

[2] The Choice Hotels Defendants additionally argue that all of Mr. Caccavale's opinions are baseless
as to them because in their franchisor role for the Orlando hotel, these Defendants do not implement
safety measures on a day-to-day basis. (Dkt. 136 at 13–14.)  Plaintiff responds: "[T]he franchisee is a
party to the case, so the extent to which [Mr. Caccavale's opinions] may also apply to the franchisor
Defendants is irrelevant as to [the opinions'] admissibility." (Dkt. 160 at 10.)  Plaintiff's point is well
taken.  Further, Mr. Caccavale's opinions do not seem limited to a day-to-day perspective.  (*See* Dkt.
126-1 at 8–14.)

("As to his purported lack of specialization in sex trafficking, . . . [Mr.] Caccavale is not strictly confined to his area of practice[] but may testify concerning related applications[:] in this instance, the well-established nexus between sex trafficking and hotel security measures." (quotation omitted)). The court notes that each of Mr. Caccavale's opinions in this case concerns hotel safety and security. (*See* Dkt. 126-1 at 8, 10–11, 13.)

As to methodology, Defendants contend that Mr. Caccavale failed to follow the methodology endorsed by the IAPSC that he claims to have used. (Dkt. 126 at 7–8; Dkt. 136 at 8–12.) Defendants do not ask the court to consider the reliability of the IAPSC's methodology but to exclude Mr. Caccavale's opinions for failure to follow that methodology. (Dkt. 126 at 7–8; Dkt. 136 at 8–12.) Courts appear to be divided as to the reliability of the IAPSC's methodology. *See Hopkins v. Nat'l R.R. Passenger Corp.*, No. 08-CV-2965 (NGG) (RML), 2015 WL 13741721, at *11, 2015 U.S. Dist. LEXIS 196952, at *35 (E.D.N.Y. Aug. 20, 2015) ("Other district courts have divided over whether the IAPSC's methodology is sufficiently reliable." (collecting cases)). However, absent any argument from Defendants on the subject, (*see* Dkt. 126 at 8 ("[T]he [c]ourt does not even have to address whether the IASPC methodology is actually reliable or not."); Dkt. 136 at 12 (describing "whether the IAPSC methodology is a reliable one" as "a question this [c]ourt need not decide")), the court agrees with the *Hopkins* court that the IAPSC's methodology is sufficiently reliable, *see* 2015 WL 13741721, at *11, 2015 U.S. Dist. LEXIS 196952, at *36 ("[B]ecause the IAPSC method has been subjected to substantial peer review at each step of its

creation, has gained substantial acceptance in the field, and has standards controlling its operation, it is sufficiently reliable."). That said, minor deviation from the IAPSC's methodology may itself constitute a sufficiently reliable methodology. (*See* Dkt. 159 at 6 ("[T]he [IAPSC's] methodology expressly recognizes that it is permissible—and expected—that a forensic consultant [such as Mr. Caccavale] may depart from the guidelines depending on the circumstances of the case." (emphasis omitted)).)

Defendants describe three ways in which Mr. Caccavale did not follow the IAPSC's methodology. (Dkt. 126 at 7–8; Dkt. 136 at 9–12.) First, Defendants assert that Mr. Caccavale did not conduct threat and vulnerability assessments at the physical property, as required. (Dkt. 136 at 9–10.) Second, according to Defendants, Mr. Caccavale looked to calls for service without sufficiently contextualizing them with other crime records such as incident reports. (Dkt. 126 at 7–8; Dkt. 136 at 9–10.) Third, Defendants argue, Mr. Caccavale improperly relied on CrimeCast information postdating the alleged 2013 trafficking incident and could not provide details about how the CrimeCast report was compiled. (Dkt. 126 at 8; Dkt. 136 at 10–12.) However, regarding these points, Mr. Caccavale testified that he conducted a vulnerability assessment based on calls for service, the CrimeCast report, and online reviews of the hotel, (Dkt. 136-2 at 41), and the CrimeCast report shows past crime risk scores for the area around the Orlando hotel in 2010, (Dkt. 126-5 at 4). Further, Defendants' arguments can be adequately addressed through the usual litigation strategies. *See United States v. Ware*, 69 F.4th 830, 848 (11th Cir. 2023) ("[T]he proper cure for sufficiently reliable but allegedly shaky scientific evidence is not exclusion[]

but vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." (alteration adopted and quotations omitted)); *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 390 (M.D. Fla. 2018) ("[W]hether an expert's opinion is accurate in light of his use of certain data goes to the weight of the evidence, not to its admissibility." (quotation omitted)); *Tillman*, 96 F. Supp. 3d at 1332 (concluding that criticism of the quality of an expert's underlying data is "more appropriately directed to the weight, rather than the admissibility[,] of th[e] evidence").

Defendants' opinion-specific arguments fare better than their general challenges to Mr. Caccavale's qualifications and methodology but are not wholly persuasive. As to the first opinion, about the predictability of the alleged sex trafficking incident, Defendants maintain that the bases cited by Mr. Caccavale in support of the opinion do not actually support it or fit the facts of this case, thereby rendering the opinion unhelpful to the factfinder. (Dkt. 126 at 9–10; Dkt. 136 at 14–15.) Because the arguments about the opinion's bases can be adequately addressed through the usual litigation strategies, the court does not exclude the first opinion. *See Ware*, 69 F.4th at 848; *In re Disposable*, 329 F.R.D. at 390; *Tillman*, 96 F. Supp. 3d at 1332. Further, the opinion may be helpful to determining whether Defendants knew or should have known about Plaintiff's alleged sex trafficking. *See Doe v. Red Roof Inns, Inc.*, 21 F.4th 714, 725 (11th Cir. 2021) ("[T]he defendant must have either actual or constructive knowledge that the venture—in which it voluntarily participated and from which it knowingly benefited—violated the TVPRA as to the plaintiff. Section 1595(a) requires

that the defendant knew or should have known that the venture has engaged in an act in violation of [18 U.S.C. §§ 1581–1597]." (alteration adopted and quotation omitted)).

As to the second opinion, about the adequacy of the training at the Orlando hotel, Defendants contend that the opinion is unreliable because Mr. Caccavale admitted to not knowing what training policies were in place at the time of the alleged sex trafficking incident. (Dkt. 126 at 10–11; Dkt. 136 at 15–17; *see* Dkt. 136-2 at 31–32.) The court agrees and thus excludes the second opinion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."); *Cordoves v. Miami-Dade County*, 104 F. Supp. 3d 1350, 1363–64 (S.D. Fla. 2015) (excluding an expert's opinion that "personnel were not properly trained" when the expert "did not review any documentation concerning training").

As to the third opinion, Defendants challenge only the statement that they "should have recognized the correlation between drug use and trafficking at their hotel." (*See* Dkt. 126 at 11–12; Dkt. 136 at 17–19.) Defendants assert that this statement "has no basis in fact" because, according to Mr. Caccavale, drug use does not always indicate human trafficking and Plaintiff used marijuana and alcohol rather than "illicit drugs that would result in discarded paraphernalia." (Dkt. 126 at 11–12; *accord* Dkt. 136 at 17–18.) Defendants further fault Mr. Caccavale for relying on "materials that post[]date the alleged trafficking period." (Dkt. 136 at 17–18.) Plaintiff

responds that opining as to a correlation between drug use and trafficking does not equate to opining that drug use always indicates trafficking. (Dkt. 159 at 13; Dkt. 160 at 16.) She also points to her marijuana use and to other drug use at the hotel, and she argues that Mr. Caccavale "logically linked [the post-trafficking materials] with the earlier trafficking." (Dkt. 160 at 15–16 & n.8; *accord* Dkt 159 at 13 & n.2.) The court agrees with Plaintiff that the challenged statement is not due to be excluded. Defendants' arguments can be adequately addressed through the usual litigation strategies. *See Ware*, 69 F.4th at 848; *In re Disposable*, 329 F.R.D. at 390; *Tillman*, 96 F. Supp. 3d at 1332.

As to the fourth opinion, Defendants challenge only the statement that "it is reasonable to conclude that the hotel management and staff knew that [Plaintiff] was being trafficked." (*See* Dkt. 126 at 12–13; Dkt. 136 at 19–20.) Defendants contend that the court should not permit Mr. Caccavale to offer this "impermissible legal conclusion." (Dkt. 126 at 12; Dkt. 136 at 19.) At trial, the jury will be called upon to decide whether Defendants, through their management and staff, had actual or constructive knowledge of Plaintiff's trafficking. *See Doe*, 21 F.4th at 725. The court thus agrees with Defendants and excludes the challenged statement. *See Doe E.M.B.*, 2025 WL 2556106, at *17, 2025 U.S. Dist. LEXIS 175050, at *52–53 (excluding the challenged statement as an impermissible legal conclusion); *see also Lorente-Garcia v. Giraldo-Navarro*, No. 24-23066-CIV, 2025 WL 2271614, at *3, 2025 U.S. Dist. LEXIS 153886, at *7 (S.D. Fla. July 9, 2025) ("[W]hile an expert may opine on an ultimate issue of fact, he may not invade the province of the jury . . . ." (quotation omitted)).

## CONCLUSION

Accordingly:

1. Defendants' *Daubert* motions concerning Mr. Caccavale (Dkts. 126, 136) are

   **GRANTED in part and DENIED in part**.

2. Mr. Caccavale's second opinion and the challenged statement in his fourth

   opinion are **EXCLUDED**.  The motions are otherwise **denied**.

   **ORDERED** in Orlando, Florida, on October 9, 2025.

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record